**Pola NEGRI, Plaintiff,**

v.

**SCHERING CORPORATION, Defendant.**

**No. 69 Civ. 2513.**

United States District Court,
S. D. New York.

Oct. 30, 1971.

Fitelson & Mayers, New York City, for plaintiff; Harold J. Sherman, New York City, of counsel.

Coudert Brothers, New York City, for defendant; Joseph A. McManus, Gordon T. King, New York City, of counsel.

## OPINION

FREDERICK van PELT BRYAN, District Judge:

In this diversity action, brought under Sections 50 and 51 of the New York Civil Rights Law, plaintiff Pola Negri, the motion picture actress, seeks damages from defendant Schering Corporation for using a photograph of her without her consent in an advertisement for defendant's pharmaceutical product, Polaramine Repetabs. Plaintiff has moved pursuant to Rule 56, Fed.R.Civ.P. for summary judgment on the issue of liability only. Defendant has cross moved for summary judgment.

Section 50 of the New York Civil Rights Law provides:

A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person * * * is guilty of a misdemeanor.

8 McKinney's Consol.Laws of N.Y., c. 14, § 50. Section 51 provides that any person whose name or picture is so used may sue and recover damages for any injuries sustained by reason of such use and that if the defendant knowingly used the person's name or picture, the jury may award exemplary damages.

The advertisement which forms the basis of the action is a double page black and white spread 16½ inches wide and 11 inches long. It was published in the May, 1969 issue of MD magazine, with a circulation of some 177,000, and six other magazines with combined circulation in excess of 175,000. The magazines were widely circulated in various states, including New York, and abroad, largely among members of the medical profession.

Two-thirds of the two-page spread is taken up with a large full-length photograph of Miss Negri as she appeared in the silent motion picture "Bella Donna", her first in the United States, and of Conway Tearle, her leading man in that picture. Miss Negri, in costume of the period, is shown standing looking down at Conway Tearle, seated cross-legged, dressed in turban and gown, with a somewhat bewildered-looking female in oriental dress sprawled across his lap. Printed words, in large letters, emerge from Tearle's mouth, addressed to Miss Negri, saying, "She has what they call antihistamine daze, dear." In response, printed words emerge from Miss Negri's mouth, in similar type, saying, "Has she tried POLARAMINE [capitalized]—dexchloreniramine maleate?"

In the righthand third of the two-page spread is a promotional screed of several paragraphs extolling the alleged superior virtues of Schering Polaramine Repetab tablets over competing products. Under the screed and Miss Negri's picture, on the righthand page of the spread, is the legend, "Allergy control with infrequent antihistamine daze" and under that, in large capital letters, "POLARAMINE REPETABS 6 MG."

In May, 1969, the advertisement in MD magazine was shown to Miss Negri in New York, while she was here on a visit from her home in Texas. She later learned of the publication in six other magazines. She seeks compensatory damages for severe emotional and mental distress and humiliation; harm to her reputation; unjust appropriation of her rights of publicity and defendant's unjust enrichment thereby; loss of income from other legitimate promotional opportunities; and punitive damages. We are concerned here only with the question of liability.

Schering admits that it caused the advertisement to be published in these seven magazines, and that this was without Miss Negri's consent or authorization. Nevertheless, Schering takes the position that it has no liability and is entitled to summary judgment or, in any event, that plaintiff has not shown sufficient to entitle her to summary judgment on the issue of liability. Schering argues that recovery is precluded under the New York Civil Rights Law because (1) the photograph as it appeared in the advertisement was not a recognizable likeness of Pola Negri and (2) that the photograph of Miss Negri in the advertisement was not used for advertising purposes or purposes of trade. Both of these arguments are devoid of merit.

(1)

■ It is plain that a picture used for advertising purposes is not actionable under the statute unless it is a recognizable likeness of the plaintiff. The picture used must be a clear representation of the plaintiff, recognizable from the advertisement itself. See People on Complaint of Maggio v. Charles Scribner's Sons, 205 Misc. 818, 130 N.Y.S.2d 514 (1954);

Levey v. Warner Brothers Pictures, Inc., 57 F.Supp. 40 (S.D.N.Y.1944); Loftus v. Greenwich Lithographing Co., 192 App.Div. 251, 182 N.Y.S. 428 (1920). See also Branson v. Fawcett Publications, 124 F.Supp. 429 (E.D.Ill.1954). Thus, where a group picture used for commercial purposes has been taken from so great a distance as to raise a question of the recognizability of any person in it, it has been held that a preliminary injunction need not be granted. Hayden v. Bristol Myers Co., 159 (17) N.Y.L.J., Jan. 24, 1968, p. 16 col. 7 (Sup.Ct.).

■ But the *Hayden* case and others similar to it have no application whatever to the case at Bar. Pola Negri's picture, as used in the Schering advertisement, is an individual, full length likeness of her, approximately 9 inches high, with features that are quite clear and characteristic. It is a clear representation of the famous motion picture star, easily recognizable as a picture of her. For example, it was recognized by the physician and friend who brought the advertisement to her attention and by four others, who were even able to identify the film from which it was taken. If there were any doubts as to the recognizability of the photograph as that of Miss Negri, and there are none, the fact that she is shown recommending PO-LAramine to her leading man, Conway Tearle, whose picture is shown next to hers, plainly point toward recognition.

There is no necessity for reviewing in any detail Miss Negri's long and well-known career in motion pictures. She starred in 40 silent films, both here and abroad. When sound came to the screen, she continued in talking pictures and starred in 10 feature talking films between 1931 and 1964. As late as 1968, one of her talking pictures was nationally televised. Another of her films was shown in 1970 at the National Gallery of Art, and others have been shown from time to time in revivals of film classics. Moreover, her autobiography, "Memoirs of a Star", was published by Doubleday in 1970. In May of that year it was reviewed in *The New York Times Book Review*, illustrated by photographs of her. Thereafter it went into a second printing. Through the long years of her career, she has, of course, been the subject of wide publicity and public comment.

■ None of this is or could well be controverted by the defendant. It is plain that, beyond her friends and acquaintances, Miss Negri's features were well known to millions of persons comprising her motion picture public. It may well be that since a number of years have elapsed since Miss Negri was at the height of her career, many persons who have seen her films are by no means as young as they once were and memories undoubtedly grow dim. But I fail to see that this is any reason to suppose that many of Miss Negri's public would not still easily recognize her as depicted in the Schering advertisement. In any event, the number of people who recognized the photograph in the advertisement as Miss Negri, while it may be relevant on the question of damages, is not material on the issue of liability. On that issue the question is whether the figure is recogniz*able*, not the number of people who recognized it.

Schering, however, urges with some vigor that the photograph in its advertisement is not recognizable as Miss Negri. It urges that Miss Negri no longer looks as she did 40 years ago when the picture was taken and is indistinguishable from any "typical" star of the silent screen. It is suggested that Miss Negri and the films in which she starred are so obscure and forgotten that no one except a "most astute" film historian could conceivably associate the picture in the advertisement with her. In support of this suggestion an affidavit is submitted of a gentleman who admits to belonging in that category. He happens to be the man who wrote the rather laudatory review of her memoirs in the New York Times Book Review of May, 1970, in which he describes her as "a star and a great one at that" and refers to "her recent work in a Disney film."

Schering also lays emphasis on a comment by Miss Negri in her 1970 autobi-

ography that when she returned to the United States in 1941, after a rather lengthy absence abroad, she was apprehensive lest she might not be remembered by her American public. Schering seems to consider this some sort of an admission against interest, which is rather hard to understand, particularly in the light of Miss Negri's continued successful film career for many years thereafter.

Finally, Schering stresses the fact that the picture of Miss Negri used in the advertisement was taken by the Schering advertising agency from a still culled from a book called "What Happened At The Office", published in 1959. The agency claims to have selected the picture to add what, with a rather odd twist of mind, it conceived to be "eye-catching humor" to the advertisement. The book used a number of still photographs from old movies and other sources with humorous captions. These were not advertisements but were merely illustrations. Miss Negri testified that she never saw or heard of the book or authorized the use of her picture in it and there is not a scintilla of evidence to the contrary. That the earlier publication of her picture was not brought to Miss Negri's attention or that no action was taken with respect to it (if, indeed, it was actionable) does not even remotely tend to show that the picture used was unrecognizable.

No doubt, Miss Negri's appearance at this writing differs substantially from what she looked like in 1922 when the picture was taken. But this, again, is beside the point. The policy underlying the New York statute is to protect "any living person" against the unauthorized use of his or her name or picture for commercial exploitation. If a picture so used is a clear and identifiable likeness of a living person, he or she is entitled to recover damages suffered by reason of such use, whether or not his or her appearance has altered through the passage of time. *See, e. g.*, Hayden v. Bristol Myers Co., *supra; cf.* Fleischer v. WPIX, Inc., 30 Misc.2d 17, 213 N.Y.S.2d 632 (Sup.Ct.1961); Gautier v. Pro-Football, Inc., 304 N.Y. 354, 107 N.E.2d 485 (1951); Jackson v. Consumer Publications, 169 Misc. 1022, 10 N.Y.S.2d 691, aff'd, 256 A.D. 965, 10 N.Y.S.2d 634 (1939).

Brauer v. Globe Newspaper Co., 351 Mass. 53, 217 N.E.2d 736 (1966), relied upon by the defendant, is clearly distinguishable, even if it could be assumed that the law of Massachusetts as to common law right of privacy is the same as that under the New York statute. That case involved the unauthorized use of the photograph of a five-year-old child which had been taken and used with proper authorization some years before. The photograph was retouched to obscure the features so as to make it unrecognizable as that of the subject without extrinsic knowledge of the circumstances under which the photograph was taken. The Massachusettes Court therefore sustained a demurrer to a claim for common law invasion of plaintiff's privacy, although it overruled a demurrer against the claim for libel.

In the case at Bar, there was no attempt to obscure or blur Miss Negri's features, nor did any obscuring or blurring occur. Anyone familiar with her appearance at the time the photograph was taken would have no difficulty recognizing her from the Schering advertisement. I hold that plaintiff has established that the photograph in the Schering advertisement is a recognizable likeness of the plaintiff.

### (2)

Schering's contention that even if the photograph is clearly recognizable as that of the plaintiff, the use of it in this advertisement was not for advertising purposes or purposes of trade is so patently without merit as to require little discussion. It is plain as a pike staff that the picture is not only used to catch the eye and focus it on the advertisement, but that Miss Negri is depicted as actually recommending the Schering product. This is a blatant use of a picture purely for advertising purposes.

Schering's theory that Miss Negri's identity is irrelevant to what the advertisement is trying to sell, even if that were the fact, and that therefore it cannot be held liable under the statute is unsupported by either authority or reason. The cases on which Schering relies to support this theory are not in point. For example, in Rand v. Hearst Corp., 31 A.D.2d 406, 298 N.Y.S.2d 405 (1969) defendant reproduced on the back cover of a book which it published an excerpt of a critical review which compared the book to the work of a well-known author, Ayn Rand. It was held that Miss Rand could not recover since the use of her name was merely incidental to the right of the publisher to inform the public of the nature of the book. In Moglen v. Varsity Pajamas Inc., 13 A.D.2d 114, 213 N.Y.S.2d 999 (1961), a piece of a newspaper containing an article concerning plaintiff was reproduced as an obscure part of a pattern on fabric used by defendant in the manufacture of pajamas. Plaintiff was denied recovery because there was no attempt to capitalize on that fact or to sell the product by the use of the plaintiff's name.

Here, Miss Negri's photograph was far from being incidental to what the advertisement was trying to sell. This was a use for advertising purposes or purposes of trade within any reasonable interpretation of those words. And this is quite apart from the indisputable fact that the picture showed *Pola* Negri recommending POLARAMINE REPETABS. The claim of Schering that this was mere coincidence strains credulity almost to the breaking point. But even if this claim were believable, the fact remains that the Pola-Polaramine combination was obviously of advantage to the defendant's sales efforts.

In Roberson v. Rochester Folding Box Co., 171 N.Y. 538, 64 N.E. 442 (1902), which led to the enactment of New York Civil Rights Law sections 50 and 51, a picture of the plaintiff was used, as here, to advertise the defendant's product. As a result of that case, holding that there was no common law right of privacy in New York, the New York Legislature was induced to adopt sections 50 and 51. The conduct of Schering and its advertising agency was in callous disregard of plaintiff's rights under the statute. Defendant has plainly violated the statute and is liable to the plaintiff in damages for any injuries she may have suffered therefrom.

(3)

█ Finally, Schering urges that the New York State courts would apply the law of Texas, where plaintiff would have no cause of action, because plaintiff is domiciled there. The argument is made that since the advertisement was published not only in New York but in other states where plaintiff is also well known, a multistate tort is alleged which, under New York conflicts of law principles (see Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963)) would relegate plaintiff to the law of Texas and that she cannot sue for relief under the New York statute.

It has long been settled New York law that the protections afforded by sections 50 and 51 apply equally to nonresidents and residents, alike. *E. g.*, Jackson v. Consumer Publications Inc., 169 Misc. 1022, 10 N.Y.S.2d 691 (Sup.Ct.1939); Hill v. Hayes, 27 Misc.2d 863, 207 N.Y.S.2d 901, 903–904 (Sup.Ct.1960). In the latter case it was squarely held that plaintiff's out-of-state residence was no bar to an action under sections 50 and 51 where the offending publication was widely circulated in New York. Defendant has shown nothing to the contrary. It concedes that Schering's advertisement was widely circulated in this state. Plaintiff is therefore entitled to sue for the violation of the New York Civil Rights statute which defendant committed.

Defendant's cross motion for summary judgment is in all respects denied. Since there are no material questions of fact to be tried on the issue of liability, plaintiff's motion for summary judgment

on that issue is granted and the case will proceed to trial on the issue of damages.

It is so ordered.